## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SAMIR JABER,**

        **Plaintiff,**

        **vs.**                                   **Civ. No. 20-261  JFR**

**ANDREW SAUL, Commissioner**
**of SOCIAL SECURITY,**

        **Defendant.**

### MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 18) filed August 20, 2020, in support of Plaintiff Samir Jaber's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Defendant" or "Commissioner") denying Plaintiff's claim for Title XVI supplemental security income.  On December 10, 2020, Plaintiff filed his Motion to Reverse and Remand for a Rehearing With Supporting Memorandum.  Doc. 25.  The Commissioner filed a Response in opposition on September 27, 2020 (Doc. 25), and Plaintiff filed a Reply on February 22, 2021 (Doc. 28).  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  Docs. 4, 10, 11.

# I.  Background and Procedural History

Plaintiff Samir Jaber ("Mr. Jaber") alleges that he became disabled on September 20, 2013, at the age of thirty-six, because of depression, post-traumatic stress disorder ("PTSD"), anxiety, hearing loss right ear, severe asthma, memory loss, back problems, balance problems, mobility problems, dizziness, chronic pain, chronic migraines/headaches, and insomnia.  Tr. 370, 374.  Mr. Jaber is an Iraqi refugee and has a limited ability to communicate in English.  He completed two years of pharmacy assistant training in 2000 while in Iraq, and worked in Iraq as a jeweler in his family's jewelry business and as a pharmacy assistant.  Tr. 39, 375.  Mr. Jaber escaped from Iraq some number of years ago under threats of death and having witnessed war violence.  Tr. 625-27, 775-76.  Since living in the United States, Mr. Jaber has worked as a home health care provider for his mother, a jewelry store driver, and a temporary employee.  Tr. 376, 382-90.  In recent months, Mr. Jaber reported working part-time as a car salesman.[2]  Tr. 1052.  Mr. Jaber reported he stopped working on September 20, 2013, because of his alleged impairments.  Tr. 374-75.

On October 18, 2013, Mr. Jaber filed an application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*.  Tr. 332-38.  On February 13, 2014, Mr. Jaber's application was denied.  Tr. 86, 87-96, 138-41.  It was denied again at reconsideration on August 14, 2014.  Tr. 97, 98-106, 147-50.  Upon Mr. Saber's request, Administrative Law Judge (ALJ) Raul C. Pardo held a hearing on July 27, 2016.  Tr. 110.

---

[2] On May 29, 2019, Mr. Jaber reported to consultative examiner Justin Beatty, M.D., that he was working 4-5 hours a day as a car salesman, sometimes working a full week when able but often only working a couple of days.  Tr. 1052. Mr. Jaber testified at the Administrative Hearing that he has a friend who owns a car dealership and he helps his friend with smalls things and whatever he is able to do.  Tr. 45.  Mr. Jaber testified that he works approximately 2-3 hours a day.  Tr. 46.  When asked if he sold cars, Mr. Jaber explained that his friend will ask him to do something, which he does right away so as not to forget, and then he waits until he is asked to do something else.  Tr. 56.  Mr. Jaber testified that his friend is accommodating of his limitations and permits him to leave after working 2 or 3 hours.  Tr. 56-57.

Mr. Jaber appeared in person at the hearing with attorney representative Jonathan D. Woods.[3]

*Id.*  On September 27, 2016, ALJ Pardo issued an unfavorable decision.  Tr. 110-22. Mr. Jaber

appealed the unfavorable decision to the Appeals Council and on July 24, 2017, the Appeals

Council declined review.  Tr. 126-30.  Mr. Jaber timely appealed to the United States District

Court of New Mexico.  *See* USDC NM Civ. No. 17-905 JHR (Doc. 1).

      Prior to filing its answer, the Acting Commissioner of Social Security moved to remand

for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).  Tr. 131-32.  The

Appeals Council vacated the ALJ's final decision and remanded for resolution of the following

issues:

> The hearing decision does not contain an evaluation of all of the medical evidence,
> and the exhibit list does not reflect all of the evidence submitted into the record
> prior to the date of the hearing decision.  The claims folder indicates that the
> claimant submitted evidence of UNM Hospital and Clinic pertaining to treatment
> from September 18, 2013, through December 18, 2015, into the electronic claims
> folder on February 15, 2016.  However, the hearing decision and the exhibit list
> attached to the decision do not reflect that the Administrative Law Judge considered
> this evidence in adjudicating the claim as required by HALLEX I-2-1-20.  This is
> particularly problematic because the noted evidence shows that the claimant did not
> have a lapse in treatment as noted in the hearing decision (Decision, page 6).
> Similarly, the evidence shows that the claimant relied on an Arabic translator when
> receiving treatment at UNM Hospital.  However, the hearing decision does not
> evaluate the claimant's ability to communicate in English.  Thus, consideration of
> this evidence is required.

Tr. 135.  On remand, the ALJ was instructed to evaluate the evidence from UNM Hospital and

Clinic pertaining to treatment from September 16, 2013, through December 14, 2015, and exhibit

it on the exhibit list pursuant to HALLEX I-2-1-20, and to proceed through the relevant steps of

the sequential evaluation process as warranted.  Tr. 135-36.

---

[3] Mr. Jaber is represented in these proceeding by Attorney Laura Johnson.

On September 18, 2019, ALJ Jessica Hodgson conducted a *de novo* hearing.  Tr. 27-77.

On January 23, 2020, ALJ Hodgson issued an unfavorable decision.  Tr. 1-17.  Mr. Jaber timely

appealed to this Court on March 23, 2020.  Doc. 1.

## II.  Applicable Law

### A.    Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance

benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income

disability benefits for adult individuals).  The Social Security Commissioner has adopted the

familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria

as follows:

(1)    At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[4]  If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.

(2)    At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, he is not disabled.

(3)    At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.

---

[4] Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. §§ 404.1572(a), 416.972(a).  "Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  *Id.*  "Gainful work activity is work activity that you do for pay or profit."  20 C.F.R. §§ 404.1572(b), 416.972(b).

(4)    If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)    If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5. The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

**B.**    <u>Standard of Review</u>

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365

F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias*, 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence "is 'more than a mere scintilla.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record," *Langley*, 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). But where the reviewing court "can follow the adjudicator's reasoning" in conducting its review, "and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). The court "should, indeed must, exercise common sense." *Id.* "The more comprehensive the ALJ's explanation, the easier [the] task; but [the court] cannot insist on technical perfection." *Id.*

### III. Analysis

The ALJ made her decision that Mr. Jaber was not disabled at step five of the sequential evaluation. Tr. 16-17. Specifically, the ALJ found that Mr. Jaber has not engaged in substantial gainful activity since the date of his application on September 20, 2013. Tr. 6. The ALJ determined that Mr. Jaber had severe impairments of PTSD, major depression, mild cervical and lumbar spine degenerative disc disease, mild asthma, headaches, status-post septoplasty with bilateral inferior turbinate reduction and right serous otitis media, polyarthritis, mild to moderate right mixed hearing loss, first distal phalanx deformity, mild left basilar atelectasis and scarring, benign paroxysmal positional vertigo, and neuropathy. *Id.* The ALJ determined that Mr. Jaber did not have an impairment or combination of impairments that met or medically equaled the severity of a listing. Tr. 8-9. Proceeding to step four, the ALJ, found that Mr. Jaber had the residual functional capacity to

> perform light work as defined in 20 CFR 416.967(b) except he can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; occasionally balance and stoop, never kneel, occasionally crouch but never crawl; he can occasionally work at unprotected heights, in weather, humidity and wetness, in extreme cold and heat, with vibration and with loud noise; he can occasionally work in dust fumes, odors, and pulmonary irritants; he is able to perform simple, routine, and repetitive tasks but not at a production pace; and he is able to make simple-work-related decisions.

Tr. 9. The ALJ concluded at step four that Mr. Jaber was not capable of performing his past relevant work as a home health care giver. Tr. 41. At step five, the ALJ found that considering Mr. Jaber's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Mr. Jaber could perform. Tr. 16. The ALJ, therefore, determined that Mr. Jaber was not disabled. Tr. 17.

On appeal, Mr. Jaber argues that ALJ Hodgson erred by (1) improperly rejecting the opinions of Mr. Jaber's treating psychiatrist Nina Gonzales, M.D., treating psychiatrist Kate

Woodward McCalmont, M.D., and citizenship and SSI evaluator Lora A. Willinghurst, M.D.; and (2) improperly rejecting the opinions of the consultative examiner Steven K. Baum, Ph.D., and consultative examiner Justin Beatty, M.D.  Doc. 25 at 16-26.  The Commissioner contends that the ALJ reasonably discounted the opinion evidence based on inconsistencies in the medical evidence record and Plaintiff's ability to work as a car salesman and participate in daily household activities.  Doc. 27 at 9-17.

For the reasons discussed below, the Court finds that the ALJ failed to apply the correct legal standards in weighing the medical opinion evidence of treating psychiatrist Nina Gonzales, M.D., treating physician Kate McCalmont, and consultative examiner Steven Baum, Ph.D., related to Mr. Jaber's ability to do work-related mental activities.  The Court also finds that the ALJ failed to provide legitimate reasons supported by substantial evidence for the weight she accorded to their opinions.  This case, therefore, requires remand.

A.    **The ALJ Failed to Apply the Correct Legal Standards in Weighing Medical Opinion Evidence and Failed To Provide Adequate Reasons Supported by Substantial Evidence for the Weight She Accorded**

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional."[5]  *Hamlin*, 365 F.3d at 1215 (citation omitted).  "An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin*, 365 F.3d at 1215. (citing *Goatcher v. United States Dep't of Health & Human Servs.*, 52

---

[5] The agency issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017.  *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); (Doc. 19 at 4 n.3.)  However, because Plaintiff filed his claims in 2013, the previous regulations still apply to this matter.

F.3d 288, 290 (10th Cir. 1995)).[6]  An ALJ's decision need not expressly apply each of the six relevant factors in deciding what weight to give a medical opinion.  *Oldham v. Astrue*, 509 F3d. 1254, 1258 (10th Cir. 2007).  The ALJ's decision for according weight to medical opinions must be supported by substantial evidence.  *Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005).

When the opinion at issue is that of the claimant's treating physician, the ALJ must first consider "whether the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the record." *Allman v. Colvin*, 813 F.3d 1326, 1331–32 (10th Cir. 2016) (quoting *Pisciotta v. Astrue,* 500 F.3d 1074, 1077 (10th Cir. 2007)).  "If so, the ALJ must give the opinion controlling weight."[7] *Id.*  Moreover, even if a treating physician's medical opinion is not entitled to controlling weight, it is "still entitled to deference" and the ALJ must decide what weight, if any, to give it, by applying the relevant regulatory factors.  *Oldham,* 509 F.3d at 1258; *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004); *Allman*, 813 F.3d at 1332; *Watkins v. Barnhart,* 350 F.3d 1297, 1301 (10th Cir. 2003).  "If the ALJ rejects the opinion completely,[s]he must then give specific, legitimate reasons for doing so."  *Allman*, 813 F.3d at 1332; *Langley*, 373 F.3d at 1119.

> In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.

---

[6] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist.  *See* 20 C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6).

[7] "A physician's opinion is deemed entitled to special weight as that of a 'treating source' when he has seen the claimant a number of times and long enough to have obtained a longitudinal picture of the claimant's impairment, taking into consideration the treatment the source has provided and the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories."  *Doyal v. Barnhart*, 331 F.3d 758, 763 (10th Cir. 2003) (quotation marks and brackets omitted).

*Langley*, 373 F.3d at 1121 (emphasis omitted) (quoting *McGoffin v. Barnhart,* 288 F.3d 1248, 1252 (10th Cir. 2002)); *Robinson*, 366 F.3d at 1082 (same).

In addition,

> when a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around. The treating physician's opinion is given particular weight because of his unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.[8]

*Hamlin*, 365 F.3d at 1215 (quoting *Doyal*, 331 F.3d at 762); *Robinson*, 366 F.3d at 1084 (same).

## 1.   Refugee Clinic, START Clinic, and Nina Gonzales, M.D.

On July 11, 2011, Kara Martinez, M.D., with the Short Term Assessment for Recovery and Treatment (START) Clinic through the University of New Mexico Behavioral Health Department, evaluated Mr. Jaber based on a referral from Psychiatrist Mohamad Khafaja, M.D.[9] Tr. 625-27. Dr. Martinez noted that Mr. Jaber reported feeling anxious and worried, that he was always expecting someone to come into his house, and that he was fearful that someone would try to kill him from behind when he is walking down the street.[10]  *Id.*  Mr. Jaber reported that he had difficulty sleeping due to hypervigilance.  *Id.*  Mr. Jaber also reported difficulties with memory and that there were times he forgets the names of his family members.  *Id.*  Mr. Jaber was requesting medication to treat his symptoms of generalized anxiety, hypervigilance,

---

[8] "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson*, 366 F.3d at 1084.

[9] Dr. Khafaja referred Mr. Jaber to the START Clinic because Mr. Jaber had missed his new patient visit at the Refugee Clinic.  Tr. 625.

[10] Mr. Jaber reported that in 2002 or 2003 he was threatened with loss of his life and was able to escape from Iraq. Tr. 625.

intrusive memories, insomnia, and difficulty with memory.  *Id.*  On mental status exam,

Dr. Martinez noted, *inter alia*, that Mr. Jaber demonstrated moderate psychomotor agitation and

that his affect was anxious with full range and reactivity.  *Id.*  Dr. Martinez made an Axis I

diagnosis of PTSD, and assessed a GAF score of 45.[11]  Dr. Martinez prescribed Sertraline and

instructed Mr. Jaber to follow up at the Refugee Clinic.  *Id.*

     As instructed, Mr. Jaber followed up at the Refugee Clinic where he saw Sara Lane,

M.D., on seven occasions from August 25, 2011, through May 24, 2012.  Tr. 606-21.  Dr. Lane

noted that Mr. Jaber continued to report significant anxiety, fear of being followed and harmed,

fear for his family, poor concentration and memory, irritability, hypervigilance and startle,

depressed mood, nightmares and insomnia.  *Id.*  Dr. Lane increased the Sertraline dosage over

time and indicated that Mr. Jaber was seeking psychotherapy from Brian Isakson.  *Id.*  Over the

course of Dr. Lane's nine months of treating Mr. Jaber, she consistently made an Axis I

diagnosis of PTSD and assessed an Axis V GAF score of 45.  *Id.*

     On July 10, 2012, Mr. Jaber returned to the START Clinic where he was evaluated by

Psychiatrist John L. Vukelich, M.D.  Tr. 575-80.  Dr. Vukelich noted that Mr. Jaber reported

being in a constant state of hypervigilance, having frequent nightmares, having daily intrusive

thoughts of memories of past violent incidents, suffering severe anxiety, and experiencing visual

hallucinations on occasion.  *Id.* On mental status exam, Dr. Vukelich noted, *inter alia*, that

Mr. Jaber was in mild to moderate distress and appeared to be dysphoric and anxious.  *Id.*

Dr. Vukelich made Axis I diagnoses of PTSD and Major Depressive Disorder ("MDD"),

---

[11] The GAF is a subjective determination based on a scale of 100 to 1 of a "clinician's judgment of the individual's overall level of functioning."  *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32.  A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job).  *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 34.

Recurrent, Severe, and assessed a GAF score of 45.  *Id.*  Dr. Vukelich discussed medications with Mr. Jaber and encouraged him to continue seeing his psychotherapist.  *Id.*  Dr. Vukelich indicated that it was likely Mr. Jaber would have a good prognosis if he continued to be medication compliant.  *Id.*

Dr. Vukelich saw Mr. Jaber again on October 22, 2012, November 27, 2012, April 12, 2013, and July 11, 2013.  Tr. 591-605.  Dr. Vukelich assessed that Mr. Jaber continued to have significant symptoms of PTSD, as well as MDD, at each visit.  *Id.*  Over the course of treating Mr. Jaber for one year, Dr. Vukelich consistently made Axis I diagnoses of PTSD and MDD, and assessed Axis V GAF scores ranging from a low of 40 to a high of 50.  *Id.*

On July 30 2013, Mr. Jaber began treatment with Psychiatrist Nina Gonzales, M.D., at the START Clinic.  Tr. 587-89.   Mr. Jaber reported that since starting Zoloft and Abilify he thought his symptoms were better, but that he continued to have difficulty with nightmares, flashbacks, hypervigilance, increased startle, and hypervigilance.  *Id.*  He also reported seeing things in his peripheral vision.  *Id.*  On mental status exam, Dr. Gonzales noted, *inter alia*, that Mr. Jaber's mood was worried and that his affect was anxious.  *Id.*  Dr. Gonzales assessed that although Mr. Jaber's symptoms of PTSD and depression were improved, they were not adequately controlled on his current medication regimen.  *Id.*  Dr. Gonzales made Axis I diagnoses of PTSD and MDD, Recurrent, Severe, without psychotic features; assessed an Axis V GAF score of 45; and adjusted Mr. Jaber's medications.  *Id.*  Mr. Jaber returned to see Dr. Gonzales on October 9, 2013, and January 13, 2014.  Tr. 582-84, 651-54.  Dr. Gonzales assessed on both occasions that Mr. Jaber's PTSD and MDD symptoms were not controlled on the current medication regimen.  *Id.*  Dr. Gonzales assessed a GAF score of 45 at both visits.  *Id.*

Against this backdrop, on January 17, 2014, Dr. Gonzales completed a Medical Certification for Disability Exceptions, a form used by the Department of Homeland Security, U.S. Citizenship and Immigration Services, for applicants who seek an exception to the English and/or civics requirements when applying for U.S. citizenship.  Tr. 813-21.  Therein, Dr. Gonzales noted Mr. Jaber's diagnoses of PTSD and MDD, and explained that severe anxiety, paranoia and flashbacks due to these conditions would not allow Mr. Jaber to have the capacity to participate in English and/or civics activities requiring even moderate amounts of concentration.  Tr. 815-16.  Dr. Gonzales also indicated that she expected Mr. Jaber's impairments to last 12 months or longer.  Tr. 815.

Approximately three months later, on April 7, 2014, Dr. Gonzales completed a *Medical Assessment of Ability To Do Work-Related Activities (Mental)* on Mr. Jaber's behalf.  Tr. 772-73. Dr. Gonzales assessed that Mr. Jaber was *moderately limited* in his ability to (1) remember locations and work-like procedures; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (7) respond appropriately to changes in the work place; and (8) be aware of normal hazards and take adequate precautions.  *Id.* Dr. Gonzales assessed that Mr. Jaber was *markedly limited* in his ability to (1) maintain attention and concentration for extended periods of time (i.e. 2-hours segments); (2) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; (3) work in coordination with/or proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest

periods; (5) travel in unfamiliar places or use public transportation; and (6) set realistic goals or make plans independently of others.  *Id.*

The ALJ accorded little weight to Dr. Gonzales's opinions, effectively rejecting them. *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012).  In doing so, the ALJ explained that "[i]n the first statement, Dr. Gonzales opined the claimant's anxiety, paranoia and flashbacks limited his ability to participate in activities requiring even a moderate amount of concentration," and by April 2014, "without explanation, Dr. Gonzales explained the claimant had marked limitations in areas such as: maintaining attention and concentration for extended periods; working with others without being distracted by them; and completing a normal workday and workweek without interruption from psychological based symptoms[.]"  Tr. 13.  The ALJ goes on to explain that the opinions are inconsistent with the medical evidence record and mental status examinations, and that multiple examinations showed the claimant had intact memory and adequate attention and concentration.  *Id.*

The ALJ's analysis fails to demonstrate she adequately applied the regulatory standards for weighing treating opinion evidence related to Mr. Jaber's ability to do work-related activities. Additionally, the ALJ's explanations for rejecting Dr. Gonzales's opinions are insufficient and not supported by substantial evidence.  As an initial matter, the ALJ's reliance on comparing Dr. Gonzales's January and April assessments as a legitimate basis for rejecting Dr. Gonzales's opinions is baseless because the ALJ fails to account for both the differences in the forms completed and the reasons for the respective assessments.  Dr. Gonzales's January assessment was made for the purpose of explaining why Mr. Jaber could not participate in English and/or civics requirements when applying for U.S. citizenship, while the April assessment was made for the purpose of assessing Mr. Jaber's abilities to do work-related mental activities.  As such, the

14

U.S. Homeland Security form that Dr. Gonzales completed in January did not seek information regarding Mr. Jaber's ability to understand, remember, or apply information in work-related activities; or his ability to sustain concentration or persist at work tasks; or his ability to socially interact with supervisors, co-workers and the public; or his ability to regulate his emotions, control his behavior, and maintain well-being in a work setting.  Thus, contrary to the ALJ's purported bewilderment over the differences in the January and April assessments, the context of the assessments and a modicum of common sense easily explain the additional limitations Dr. Gonzales assessed in April.  Moreover, the Court sees no inconsistency between Dr. Gonzales's assessment in January that Mr. Jaber could not participate in any activities requiring even moderate amounts of concentration and her April assessment that he was markedly limited in his ability to do so, as the Commissioner argues.  In other words, the Court can see little distinction between having *less than* a moderate ability to concentrate on the one hand and a marked ability to concentrate on the other.  As such, the ALJ's explanation for discounting Dr. Gonzales's opinions is insufficient and not supported by substantial evidence.

That aside, the ALJ's analysis fails to demonstrate she adequately applied the regulatory standards for weighing opinion evidence.  To begin, the ALJ states that Dr. Gonzales' opinions are inconsistent with the medical evidence record, yet points to no opinion evidence or the "record as a whole" that contradict Dr. Gonzales's opinions.  *Langley*, 373 F.3d at 1211 (an ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence); *see also* 20 C.F.R. 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the *record as a whole*, the more weight we will give to that opinion.") (emphasis added).  Instead, the ALJ only cites three mental status exams in which Dr. Gonzales on two occasions and consultative examiner Justin Beatty, M.D. on one occasion indicated that Mr. Jaber had

"intact memory and adequate attention and concentration."  Tr. 13 (citing Tr. 583, 647, 1053).

Critically, however, in doing so the ALJ mischaracterizes these entries, *i.e.,* Dr. Gonzales

indicated that Mr. Jaber's memory was "not formally tested," and Dr. Beatty indicated that

Mr. Jaber's memory, attention and concentration were "adequate for the interview though not

formally tested."[12]  Tr. 583, 647, 1053.  Further, the ALJ's reliance on two (out of fifteen)

aspects of three mental status exams for rejecting Dr. Gonzales's opinions fails to present the full

context of Mr. Jaber's mental status exams, *i.e.,* that Mr. Jaber exhibited psychomotor agitation

(shifting in chair and leg shaking), had poor eye contact, and was anxious; as well as that

Mr. Jaber consistently reported ongoing and uncontrolled symptoms associated with and

treatment for PTSD and MDD for approximately three years by the time Dr. Gonzales completed

her assessment of Mr. Jaber's ability to do work-related mental activities.[13]  Tr. 575-80, 582-84,

587-89, 591-605, 606-24, 625-27, 651-54.  "It is improper for the ALJ to pick and choose among

medical reports, using portions of evidence favorable to h[er] position while ignoring other

evidence."  *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (citing *Switzer v. Heckler*,

742 F.2d 382, 385-86 (7th Cir. 1984)); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir.

1996) (the record must demonstrate that the ALJ considered all of the evidence and must discuss

the uncontroverted evidence she chooses not to rely upon, as well as significantly probative

evidence she rejects).

---

[12] The ALJ also failed to discuss that even though Dr. Beatty indicated on mental status exam that Mr. Jaber's memory was "adequate for the interview though not formally tested," he conducted a Mini Mental State Exam on which Mr. Jaber scored 8/30.  Tr. 1054.  Dr. Beatty relied on this objective testing to assess that Mr. Jaber had significant memory problems concerning for possible dementia.  *Id.*

[13] This evidence is in direct contrast to the ALJ's statement that Mr. Jaber had not required consistent mental health treatment from any health professional, and medical records do not reflect severe psychiatric symptoms, severe mood disturbance, or behavioral disturbance.  Tr. 8.

More significantly, however, in failing to apply the required regulatory factors, the ALJ ignored certain factors which direct according greater weight to Dr. Gonzales's opinions, *i.e.,* Dr. Gonzales's treatment relationship with Mr. Jaber, her area of specialization, the consistency of her diagnoses and assessed GAF scores of 45[14] with Mr. Jaber's other mental healthcare providers,[15] and the consistency of Dr. Gonzales's opinions with other treating and consultative source opinions in the medical evidence record.[16]   *See* 20 C.F.R. 419.927(c)(4) (explaining that the more consistent a medical opinion is with the record as a whole, the more weight will be given to that opinion); *see also* 20 C.F.R. 416.927(c)(2)(ii), (c)(3), and (c)(5) (explaining that more weight is generally given to a treating source, to opinions that are supported with medical signs and laboratory findings, and to specialists who provide opinions on medical issues in their area of specialty).

---

[14] The ALJ accorded little weight to the GAF scores assessed, pointing only to limited aspects of one mental status exam. Tr. 12 (citing Tr. 826).  However, longitudinal treatment notes from Mr. Jaber's mental health care providers in the START Clinic and Refugee Clinic support Dr. Gonzales's diagnoses and also demonstrate GAF scores between 41-50 over a significant period of time indicating serious symptoms related to Mr. Jaber's overall level of mental functioning. Tr. 575-80, 591-605, 606-24.  *See generally*, *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164 (10th Cir. 2012) (considering GAF scores and expressing "concern" with scores of 46 and 50); *Lee v. Barnhart*, 117 F. App'x 674, 678 (10th Cir. 2004) (unpublished) ("Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work . . ." but "[a] GAF score of fifty or less, . . . does suggest an inability to keep a job.").

[15] Dr. Gonzales's diagnoses and assessed GAF scores were consistent with Mr. Jaber's previous psychiatric treating providers Sara Lane, M.D., and John L. Vukelich, M.D.  Tr. 575-80, 591-605, 606-24.

[16] On February 12, 2014, nonexamining State agency psychological consultant Cathy Simutis, Ph.D., assessed that Mr. Jaber had *moderate limitations* in his ability to maintain attention and concentration.  Tr. 94.  On March 23, 2019, consultative examiner Steven K. Baum, Ph.D., assessed that Mr. Jaber had *marked limitations* in his ability to maintain attention and concentration for extended periods of time.  Tr. 1013.  On April 10, 2019, treating physician Samir K. Kassicieh, D.O., assessed that Mr. Jaber had *moderate limitations* in his ability to maintain attention and concentration for extended periods (i.e., 2-hour segments).  Tr. 1024.  On May 29, 2019, consultative examiner Justin Beatty, M.D., assessed that Mr. Jaber had *moderate limitations* in his ability to concentrate and *severe limitations* in his ability to persist at work-related tasks.  Tr. 1049.  On September 5, 2019, treating physician Kate Woodword McCalmont, M.D., assessed that Mr. Jaber had *marked limitations* in his ability to maintain attention and concentration for extended periods of time (i.e., 2-hour segments).  Tr. 1078-79.

Apart from this, and by limiting her focus only on whether Dr. Gonzales's assessed limitation of Mr. Jaber's ability to remember, maintain attention, and concentrate was inconsistent with the medical record evidence, the ALJ failed to address at all Dr. Gonzales's other assessed limitations of Mr. Jaber's ability to do work-related mental activities that could significantly impact his ability to do even unskilled work.  For example, Dr. Gonzales assessed that Mr. Jaber had *marked limitations* in his ability to, *inter alia*,  (1) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (2) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 772-73.  These requirements are considered critical for performing unskilled work and defined as being "usually strict."[17]  *See* POMS DI 25020.010.B.3 – *Mental Abilities Critical for Performing Unskilled Work*.  Notably, other treating and consultative opinion evidence in the medical evidence record supports these assessed limitations.[18]

---

[17] Maintaining regular attendance and being punctual within customary tolerances is "usually strict."  *See* POMS DI 25020.010.B.3 – *Mental Abilities Critical for Performing Unskilled Work*.  Maintaining a schedule is not critical.  *Id.*

[18] On March 23, 2019, consultative examiner Seven K. Baum, Ph.D., assessed that Mr. Jaber suffers *moderate to marked limitations* in his ability to (1) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (2) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 1013.  On April 10, 2019, treating physician Samir K. Kassicieh, D.O., assessed that Mr. Jaber had *moderate limitations* in his ability (1) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (2) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.).  Tr. 1024.  On September 5, 2019, treating physician Kate Woodword McCalmont, M.D., assessed that Mr. Jaber had *moderate limitations* in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and *marked limitations* in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 1078-79.

2.      **Kate Woodword McCalmont, M.D.**

On September 5, 2019, treating physician Kate Woodword McCalmont, M.D., completed

a *Medical Assessment of Ability To Do Work-Related Activities (Mental)* on Mr. Jaber's behalf.

Tr. 1078-79.  Dr. McCalmont assessed that Mr. Jaber had *moderate limitations* in his ability to

(1) remember locations and work-like procedures; (2) carry out detailed instructions; (3) perform

activities within a schedule, maintain regular attendance and be punctual within customary

tolerance; (4) sustain an ordinary routine without special supervision; (5) work in coordination

with/or proximity to others without being distracted by them; (6) ask simple questions or request

assistance; (7) get along with coworkers or peers without distracting them or exhibiting

behavioral extremes; (8) travel in unfamiliar places or use public transportation; and (9) set

realistic goals or make plans independently of others.  Tr. 1078-79.  She assessed that Mr. Jaber

had *marked limitations* in his ability to (1) understand and remember detailed instructions;

(2) maintain attention and concentration for extended periods of time (i.e. 2-hours segments);

and (3) complete a normal workday and workweek without interruptions from psychological

based symptoms and to perform at a consistent pace without unreasonable number and length of

rest periods.  *Id.*

The ALJ accorded little weight to Dr. McCalmont's opinion, effectively rejecting it.

*Chapo,* 682 F.3d at 1291.  In doing so, the ALJ explained, without more, that Dr. McCalmont

"acknowledged the mental limitations were primarily based on patient report."  Tr. 14.  This is

insufficient.  First, the ALJ mischaracterizes Dr. McCalmont's comment and fails to include all

of her comments included with her assessment.  Dr. McCalmont explained as to Mr. Jaber's

abilities to understand and remember that he was "[u]nable to remember work-related

procedures, has to take notes or write notes to himself on his hand.  Forgets instructions, names

very quickly." Tr. 1078-79. Dr. McCalmont explained as to Mr. Jaber's ability to sustain

concentration and persist at tasks that "[t]his section is completed primarily with patient report

*and knowledge of his underlying psychiatric issues*." *Id.* (emphasis added). Dr. McCalmont

explained as to Mr. Jaber's ability to socially interact in the workplace that "[s]ocial interaction

is limited by anxiety and hyper-vigilance (due to PTSD)." *Id.* And finally, Dr. McCalmont

explained as to Mr. Jaber's ability to adapt to the workplace that "[p]atient has difficulty being in

new situations or traveling to unknown places. Gets claustrophobic." *Id.* As such, the ALJ's

lone explanation for discounting Dr. McCalmont's assessment of Mr. Jaber's ability to do work-

related mental activities is not supported by substantial evidence.

Second, as more thoroughly discussed above with respect to Dr. Gonzales's opinion

evidence, the ALJ similarly failed to apply any of the regulatory factors in evaluating

Dr. McCalmont's opinion as she was required to do. *See infra*, pp. 14-17.

### 3.   Consultative Examiner Steven K. Baum, Ph.D.

On March 23, 2019, Steven K. Baum, Ph.D., interviewed Mr. Jaber and conducted

psychological testing related to Mr. Jaber's complaints of PTSD, MDD, and anxiety. Tr. 1008-

18. All told, Dr. Baum spent eleven hours in clinical interview, medical record review, report

writing, and psychological testing.[19] *Id.* On exam, Dr. Baum noted, *inter alia*, that Mr. Jaber

was alert, oriented times three and behaviorally appropriate. Tr. 1008. He also noted that

Mr. Jaber exhibited psychomotor agitation and poor eye contact. *Id.* Dr. Baum indicated that

Mr. Jaber was able to spell a five-letter word forward correctly, but could not spell it backwards;

was unable to complete serial three's to one place; forgot to bring his medication list after being

---

[19] Dr. Baum administered the St. Louis University Mental Status Exam, the Wechsler Abbreviated Scale of Intelligence-II, the Minnesota Multiphasic Personality Inventory, and the PCL-5. Tr. 1009.

reminded twice; was unable to name his physician; and was unable to recall his age. *Id.*
Dr. Baum also indicated that Mr. Jaber admitted paranoid ideation, *i.e.,* someone following him,
and that Mr. Jaber reported he was not always certain where he was. *Id.*

Dr. Baum noted that from other clinicians and patient's history, there was a
preponderance of evidence regarding Mr. Jaber's diagnoses of PTSD, MDD, and anxiety. Tr.
1010. Dr. Baum also indicated evidence of undiagnosed psychosis or schizophrenia and
impaired memory based on his interview with Mr. Jaber, mental status exam, and psychometric
testing. *Id.*

In conjunction with his psychological evaluation, Dr. Baum completed a *Medical
Assessment of Ability to Do Work-Related Activities (Mental)* on Mr. Jaber's behalf. Tr. 1013-
14. The instructions directed Dr. Baum to consider Mr. Jaber's medical history and the
chronicity of findings from at least 2013 through the current examination. *Id.* Dr. Baum
assessed that Mr. Jaber was *slightly limited* in his ability to (1) make simple work-related
decisions; (2) interact appropriately with the general public; and (3) ask simple questions or
request assistance. *Id.* Dr. Baum assessed that Mr. Jaber was *moderately limited* in his ability to
(1) understand and remember very short and simple instructions; (2) carry out very short and
simple instructions; and (3) work in coordination with or proximity to others without being
distracted by them. *Id.* Dr. Baum assessed that Mr. Jaber was *moderately to markedly limited* in
his ability to (1) perform activities within a schedule, maintain regular attendance and be
punctual within customary tolerance; (2) sustain an ordinary routine without special supervision;
(3) complete a normal workday and workweek without interruptions from psychological based
symptoms and to perform at a consistent pace without unreasonable number and length of rest
periods; (4) get along with coworkers or peers without distracting them or exhibiting behavioral

21

extremes; and (5) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. *Id.* Lastly, Dr. Baum assessed that Mr. Jaber was *markedly limited* in ability to (1) remember locations and work-like procedures; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) maintain attention and concentration for extended periods of time (i.e., 2-hour segments); (5) accept instructions and respond appropriately to criticism from supervisors; (6) respond appropriately to changes in the work place; (7) travel in unfamiliar places or use public transportation; and (8) set realistic goals or make plans independently of others.

Dr. Baum also completed forms for Listings 12.04 – *Depressive, Bipolar and Related Disorders*; 12.06 – *Anxiety and Obsessive-Compulsive Disorders*; and 12.15 – *Trauma and Stressor-Related Disorders*. Tr. 1015-18. Dr. Baum assessed that Mr. Jaber met certain diagnostic criteria for each listing that resulted in marked and extreme functional limitations. *Id.*

The ALJ accorded Dr. Baum's opinion little weight. Tr. 13-14. She explained that his assessments were

> inconsistent with the preponderance of the evidence of record including psychiatric and other examinations through the period at issue. His opinions appear to be primarily based on the claimant's subjective allegations rather than objective clinical testing. He speculated that the claimant may have schizophrenia, dementia, and traumatic brain [in]jury with no objective evidence. For example, Dr. Braun [sic] admits he is "unable to provide documented evidence demonstrating impaired memory" and notes a CT scan of the head was negative (Exhibit 9F, page 4). As noted above, it is also highly unlikely and somewhat incredulous that the claimant could perform work as a car salesperson (an occupation requiring detailed and complex job tasks) if the claimant had severe memory impairment, dementia, or was unable to communicate in English.

Tr. 13-14. The Court finds the ALJ's explanations insufficient and not supported by substantial evidence.

To begin, the ALJ fails to point to any specific evidence that demonstrates Dr. Baum's assessment is inconsistent with the preponderance of the evidence of record, including psychiatric and other examinations throughout the period at issue. To the contrary, the opinion evidence is overwhelmingly consistent with Dr. Baum's findings.[20] Next, the ALJ states that Dr. Baum's explanation that his opinions appear to be based primarily on the claimant's subjective allegations completely ignores that Dr. Baum reviewed medical records and administered multiple psychometric tests. Third, as with her misapplication of the regulatory standards for weighing Dr. Gonzales's opinions, the ALJ again mischaracterizes the statements in Dr. Baum's report. The ALJ states that Dr. Baum admits he is "unable to provide documented evidence demonstrating impaired memory," but fails to include "as combat induced and progressive." Tr. 1010. In other words, Dr. Baum suspected that Mr. Jaber's impaired memory was related to his having lived in a war zone where he experienced compression bombs and IUD explosives and shelling. *Id.* That said, Dr. Baum indicated he would likely be unable to provide documented evidence of that as a source of Mr. Jaber's impaired memory. *Id.* Finally, the ALJ explained it was highly unlikely "and somewhat incredulous" that Mr. Jaber could perform work as a car salesperson if the claimant had severe memory impairment. Yet Mr. Jaber's work as a car salesperson is far from the "detailed and complex job" the ALJ insists upon. Mr. Jaber testified that he works 2-3 hours a day for a friend who owns a car dealership. Tr. 46. Mr. Jaber testified that he helps with small things, completes one task at a time at the direction of his friend, and waits until asked to do something else. Tr. 45, 56. Further, Mr. Jaber testified that

---

[20] *See* Medical Assessment of Ability To Do Work-Related Activities (Mental) prepared by Psychiatrist Nina Gonzales, M.D. (Tr. 772-73); Medical Assessment of Ability To Do Work-Related Activities (Non-Physical) prepared by treating provider Samir K. Kassicieh, D.O. (Tr. 1024; Medical Statement of Ability To Do Work-Related Activities (Mental) prepared by Justin Beatty, M.D. (Tr. 1045-49); and Medical Assessment of Ability To Do Work-Related Activities (Mental) prepared by Treating Psychiatrist Kate Woodword McCalmont, M.D. (Tr. 1078-79).

his friend accommodates Mr. Jaber's impairments and permits him to leave after only 2-3 hours of work.  Tr. 56-57.  As such, the ALJ has completely mischaracterized Mr. Jaber's work as a car salesperson.

In sum, the ALJ has failed to provide any legitimate reasons supported by substantial evidence for discounting Dr. Baum's opinion.  Moreover, the ALJ's analysis fails to demonstrate that she applied the correct legal standards for weighing medical opinion evidence.  Dr. Baum is a psychologist and, thus, specializes in mental health.  Dr. Baum's report is substantiated by his clinical examination, his review of Mr. Jaber's medical records from the relevant period of time, his administration of psychological tests, and his diagnoses.  Further, Dr. Baum is an examining physician.  As previously stated, Dr. Baum's assessment is consistent with the other treating and consultative opinion evidence in the medical evidence record.[21]  There is no evidence that the ALJ considered any of these regulatory factors when she weighed Dr. Baum's opinion.

For all of the foregoing reasons, the Court finds that the ALJ failed to apply the correct legal standard when weighing the medical opinion evidence of treating psychiatrist Dr. Nina Gonzales, treating physician Dr. Kate McCalmont, and consultative examiner Dr. Steven Baum, and failed to provide legitimate reasons supported by substantial evidence for the weight she accorded their opinions.  This case, therefore, requires remand.

## B.    Remaining Issues

The Court will not address Mr. Jaber's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

---

[21] *See* fn. 20, *supra.*

## IV.  <u>Conclusion</u>

For the reasons stated above, the Court finds Mr. Jaber's Motion to Reverse and Remand

for a Rehearing With Supporting Memorandum (Doc. 25) is well taken and is **GRANTED.**


**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**
**Presiding by Consent**

25